CLOSED

# U.S. District Court
# Western District of Kentucky (Owensboro)
# CRIMINAL DOCKET FOR CASE #: 4:22–mj–00068–HBB All Defendants

Case title: USA v. Sailors

Date Filed: 11/04/2022

Date Terminated: 11/07/2022

Assigned to: Magistrate Judge H. Brent Brennenstuhl

**Defendant (1)**

**Douglas Sailors**
*TERMINATED: 11/07/2022*

| **Pending Counts** | **Disposition** |
| --- | --- |
| None | |

| **Highest Offense Level (Opening)** | |
| --- | --- |
| None | |

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

| **Highest Offense Level (Terminated)** | |
| --- | --- |
| None | |

| **Complaints** | **Disposition** |
| --- | --- |
| RULE 5 from Southern District of Florida | |

**Plaintiff**

| **USA** | represented by | **Mark J. Yurchisin , II** |
| --- | --- | --- |
| | | U.S. Attorney Office – Bowling Green |
| | | 241 East Main Street, Suite 305 |
| | | Bowling Green, KY 42101 |
| | | 270–999–7009 |
| | | Email: mark.yurchisin@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Retained* |

1

| Date Filed | # | Select all / clear | Docket Text |
|---|---|---|---|
| 11/04/2022 | | Arrest (Rule 5) of Douglas Sailors (DJT) (Entered: 11/07/2022) | |
| 11/04/2022 | 1 | Rule 5 Documents Received from Southern District of Florida, Case Number 22–60210–CR–SINGHAL/DAMIAN as to Douglas Sailors (DJT) (Entered: 11/07/2022) | |
| 11/04/2022 | 2 | Case Assignment (Random Selection): Case Assigned to Magistrate Judge H. Brent Brennenstuhl. (DJT) (Entered: 11/07/2022) | |
| 11/04/2022 | | Proceedings held before Magistrate Judge H. Brent Brennenstuhl; Initial Appearance in Rule 5(c)(3) Proceedings as to Douglas Sailors held on 11/4/2022 (Court Reporter Digitally Recorded.) (DJT) (Entered: 11/07/2022) | |
| 11/04/2022 | 3 | ORDER by Magistrate Judge H. Brent Brennenstuhl on 11/4/22 as to Douglas Sailors : IT IS ORDERED the Defendant shall be released on a $250,000.00 secured property bond pending the trial of this action. IT IS FURTHER ORDERED the Southern District of Florida will schedule Defendant to appear for arraignment. cc: AUSA, USP, USM, USDC – SD/FL (DJT) (Entered: 11/07/2022) | |
| 11/04/2022 | 4 | APPEARANCE BOND AND ORDER SETTING CONDITIONS OF RELEASE: Property Bond Entered as to Douglas Sailors in amount of $ 250,000. (Attachments: # 1 Exhibit Deed, # 2 Exhibit Quitclaim Deed) (DJT) (Entered: 11/07/2022) | |
| | | *Main Document* | |
| | | Attachment # 1 *Exhibit Deed* | |
| | | Attachment # 2 *Exhibit Quitclaim Deed* | |
| 11/04/2022 | 5 | WAIVER OF RIGHT TO HAVE APPOINTED COUNSEL by Douglas Sailors. (DJT) (Entered: 11/07/2022) | |
| 11/04/2022 | 6 | WAIVER OF RULE 32.1 HEARING by Douglas Sailors (DJT) (Entered: 11/07/2022) | |

4. 22MJ-68-HBB

FILED by ___MM___ D.C.

Oct 12, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

## 22-60210-CR-SINGHAL/DAMIAN

CASE NO. _____

18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1349
26 U.S.C. § 7206(1)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)

UNITED STATES OF AMERICA

v.

DOUGLAS SAILORS,

Defendant.

_____/

### INDICTMENT

The Grand Jury charges that:

### COUNT 1

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### Background

A.    **Formation of the Charities**

1.     On February 28, 2007, at the direction of defendant DOUGLAS SAILORS (hereinafter referred to as "SAILORS"), Disabled Veterans Services, Inc. (DVS) was formed as a corporation in the state of Tennessee.  On August 2, 2011, DVS applied for authorization to conduct its affairs in Florida.  DVS was an alleged non-profit charitable organization that obtained tax-exempt status with the Internal Revenue Service (IRS).  The stated mission of DVS was to

1

promote charity, education and charitable causes by assisting United States Military Veterans in their education, training, employment and general assimilation into civilian life.

2.     On or about May 20, 2009, Seven Sisters of Healing, Inc. (hereinafter referred to as "Seven Sisters") was formed at the direction of defendant SAILORS.  It was formed as an alleged non-profit charitable organization.  Seven Sisters obtained tax-exempt status with the IRS in or about 2009.   In or about 2011, at SAILORS' direction, Seven Sisters changed its name to Community Charity Advancement, Inc. (hereinafter referred to as "CCAI").  CCAI registered the following fictitious names: Breast Cancer Research and Support Fund, United States Firefighters Association, and U.S. Volunteer Firefighters Association.  In the Articles of Incorporation, the stated mission purpose of CCAI was to provide health care services and products and related assistance to those in need in the United States and Central and South America; to provide assistance to victims of fire, storm and other natural disasters, and to further other charitable and educational purposes as described in Section 501(c)(3) of the Internal Revenue Code.

3.     In or about July 2012, National Community Advancement, Inc., (hereinafter referred to as "NCA") was formed at the direction of Defendant SAILORS in Delaware.  In or about March 2016, NCA applied for authorization to conduct its affairs in Florida as a not-for-profit corporation.  In its application, NCA set forth its stated purpose as "charitable/breast cancer awareness & prevention."

B.     **Formation of the Charity Management Companies**

4.     In or about 2005, F.U.M. Management Corporation (hereinafter referred to as "FUM"), was incorporated in Nevada at the direction of defendant SAILORS.  From in or about 2007 through in or about 2014, FUM was utilized as a purported charity management company to

allegedly manage the operations of DVS, Seven Sisters, and CCAI (hereinafter collectively referred to as "the Charities").

5.     Defendant SAILORS' relative (hereinafter referred to as "Individual 1") was the chairman and president of record of FUM beginning at least as early as September 21, 2009.

6.     Beginning in or about March 2014, FUM changed its name to Associated Charity Management (hereinafter referred to as "ACM"). In or about May 2014, defendant SAILORS, through interstate wire and electronic communications, directed that a nominee (hereinafter referred to as the "Nominee President") be listed as the chairman and president of record of ACM. The Nominee President understood that he would act solely in accordance with the directions of defendant SAILORS. The Nominee President had minimal interaction with the Charities. The Nominee President was used by defendant SAILORS to conceal defendant SAILORS' participation the Charities and the Charity Management Companies.

7.     In or about 2006, HMDM Management, Inc. (hereinafter referred to as "HMDM") was incorporated in Nevada at the direction of defendant SAILORS. It was a management company whose voting stock was owned by the SO Trust and the Palmer Trust. Defendant SAILORS and/or Individual 1 owned and/or controlled both the SO Trust and the Palmer Trust. Defendant SAILORS directed that the Nominee President of ACM also be listed as the president of HMDM.

8.     On April 13, 2016, an officer/director for HMDM filed in Nevada a "Fictitious Firm Name" for HMDM. The officer/director certified that HMDM was conducting business under the fictitious name Nurse Placement International (hereinafter referred to as "NPI").

C.    <u>Regulations regarding the operation of charitable organizations</u>

9.    Charitable organizations which solicit donations are governed by certain State and Federal laws and regulations.  For example, a charitable organization which intends to solicit contributions in or from the state of Florida must file an initial registration statement, and a renewal statement annually thereafter, with the Florida Department of Agriculture and Consumer Services. § 496.405(1), Fla. Stat. (2014).  A charitable organization may solicit contributions only for the purpose expressed in the solicitations for contributions or the registration statement and may apply contributions only in a manner substantially consistent with that purpose.  § 496.411(1), Fla. Stat. (2014).

10.    An individual being solicited may request a written financial statement about the charitable organization.  Among other things, the written financial statement must state the purpose for which funds are raised, the total amount of all contributions raised, the total costs and expenses incurred in raising contributions, and the total amount of contributions dedicated to the stated purpose or disbursed for the stated purpose.  § 496.411(2)(e), Fla. Stat. (2014).

11.    State and Federal regulations regarding the establishment, operation and management of charity activities exist to ensure the lawful conduct of charitable organizations and to allow potential donors the ability to make an informed decision prior to contribution.

12.    A charitable organization's **Board of Directors** has three primary legal duties.

A.    Duty of Care – Care of the nonprofit entity by ensuring prudent use of all assets, including facility, people, and of good will;

B.    Duty of Loyalty – Ensure that the non-profit's activities and transactions are advancing its mission, recognize and disclose conflicts of interest and make decisions that are in the best interest of the non-profit entity (not in the interest of the individual board member); and

4

C.      Duty of Obedience – Ensure that the non-profit entity obeys applicable laws and regulations, follows its own by-laws and adheres to its stated mission/purpose.

13.      A charitable organization's **Officers** are elected or appointed by the board of directors.

A.      An officer's responsibility is to carry out the non-profit entity's day to day business within the scope of their delegated authority.

B.      The officers of a non-profit entity are the agents through which the board of directors act.

D.      **Tax-Exempt Status - The IRS**

14.      Charitable organizations seek tax-exempt status from the Internal Revenue Service which entitles the charities to certain benefits, including not having to pay any federal income tax and allowing every donor to claim a tax deduction for contributions to the charitable organization. A tax-exempt organization must be organized exclusively for exempt purposes and must not be organized or operated for the benefit of private interests.

15.      A charitable organization can obtain tax-exempt status by filing IRS Form 1023, the Application for Recognition of Exemption, under Section 501(c)(3) of the Internal Revenue Code, which requires the identification of the applicant, and a listing of officials, board of directors and trustees.

16.      A charitable organization that obtains tax-exempt status that has gross receipts exceeding $50,000 is required to file a Form 990 every year with the IRS, which provides the IRS an overview of the charitable organization's yearly activities. This information includes a description of the charitable organization's primary exempt purpose, program service accomplishments, and disclosure of financial details on revenue, expenses, assets and liabilities.

The financial details include the percentage of donations received by the charitable organization that goes to furthering the mission of the charitable organization, otherwise called the program services, and conversely the percentage of donations received that pay administrative expenses, such as salaries and management and other fees paid to persons operating the charitable organization.

17.    IRS Form 990 is a public document intended for use by potential donors in order that informed decisions can be made as to whether to donate to a charitable organization.

18.    In or about 2015, the IRS revoked the tax-exempt status of DVS based upon the failure to demonstrate that DVS was operating for exempt purposes.

E.    **Disqualified Persons**

19.    Any person who is in a position to exercise substantial influence over the affairs of a tax-exempt organization is referred to by the IRS as a disqualified person.   A disqualified person includes anyone who, regardless of title, is in charge of implementing decisions of the governing body and anyone who, regardless of title, is in charge of managing the organization's finances. Certain disclosures are required for disqualified persons.

20.    A disqualified person who receives any money in exchange for services or property of a tax-exempt charitable organization cannot receive in excess of the fair market value for the services or property, otherwise the disqualified person must pay an excess benefits tax equal to 25% of the payment in excess of fair market value.   The disqualified person receiving the excess benefit must correct, that is, pay back, the excess benefit within the taxable period, otherwise a tax equal to 200% of the excess benefit is imposed.   All excess benefits must be reported by the charitable organization on the IRS Form 990 for the year paid, and the disqualified person must pay back the excess benefit.

F.   **Additional Obligations of Charitable Organizations**

21.   The Attorney General's Office for each state has the responsibility for overseeing the propriety of the activities undertaken by charitable organizations operating in their state.

22.   As is set forth above, every charitable organization that solicits contributions in or from the state of Florida is required to annually file information regarding the board members and the nature of the charitable organization's operations. The annual filing is made with the Florida Department of Agriculture and Consumer Services. In these filings, a charitable organization is required to disclose whether any of its officers, directors, trustees, or employees have been convicted of, or found guilty of, or pled guilty to, or been incarcerated within the last ten years for any felony. It also requires the charitable organization to disclose whether any of its officers, directors, trustees, or employees have been convicted of, or found guilty of, or pled guilty to, or been incarcerated within the last ten years for any crime involving fraud. §§ 496.405(2)(d)5 and 496.405(2)(d)6, Fla. Stat. (2014). A charitable organization may not knowingly allow an officer, director, trustee, or employee to solicit contributions on behalf of such organization if such officer, director, trustee, or employee has been convicted of, or found guilty of, or pled guilty to, or been incarcerated within the last ten years for any felony, or any crime involving fraud. § 496.405(8), Fla. Stat. (2014).

G.   **Defendant SAILORS' Criminal Convictions**

23.   In or about January 1999, defendant SAILORS was convicted of a felony involving fraud.

24.   In or about October 1999, defendant SAILORS was convicted of a felony involving fraud and was released from incarceration on or about June 2002.

H.     **Charitable Solicitations**

25.     All the cash donations made to the Charities were as a result of telephone solicitations made by call centers hired by the Charities at the direction of defendant SAILORS.

26.     The Charities primarily used one call center service (hereafter referred to as the "Charity Solicitor"), which was located in Las Vegas, Nevada and had telephone solicitors located in Honduras, the Philippines, and Guatemala.  The Charity Solicitor wrote the solicitation speeches on behalf of the Charities and employed hundreds of telephone solicitors who placed telephone calls in interstate and foreign commerce to potential donors seeking cash donations on behalf of the Charities. The Charity Solicitor placed the donated monetary proceeds in the Charities' bank accounts.

27.     In return for its services, the Charity Solicitor received approximately 87 ½ percent of all the cash donations sent to the Charities and the Charities received the remaining 12½ percent.

I.     **Gifts-In-Kind**

28.     In addition to cash donations, a charitable organization may also receive and distribute goods.   These goods are referred to as gifts-in-kind.

29.     The charitable organizations receiving the gifts-in-kind can distribute them to other charitable organizations that agree to donate the goods consistent with the restrictions set forth by the manufacturers and the mission of the donating charitable organization.  For example, pharmaceutical manufacturers donate excess goods, such as pharmaceutical medications, that are near expiration or otherwise are no longer for sale to the public.  In many cases, these goods are donated to the charitable organization with restrictions, such as the goods cannot be resold or are forbidden from being distributed in the United States.

30. If the charitable organization obtains custody and control over the goods, the tax laws allow a charitable organization to include in revenue and subtract as a deduction the gifts-in-kind they receive and distribute consistent with their stated mission. Because individuals being solicited can request information about the total amount of contributions being disbursed for the stated charitable purpose, charitable organizations that distribute a low percentage of their cash donations will utilize gifts-in-kind to increase the percentage of revenues (hereinafter referred to as the "Ratio") disbursed to further the mission of the charitable organization.

### J. Hiring of Professionals

31. Defendant SAILORS retained the services of professionals, including lawyers, accountants, and bookkeepers on behalf of the Charities to allegedly assist defendant SAILORS and the Charities in collecting and disbursing the cash donations, handling the administrative tax filings, preparing legal opinions, and responding to the investigative and administrative agencies and civil litigation. Such professionals were paid by defendant SAILORS to facilitate the fraud.

### K. Douglas W. Sailors' Defined Benefit Plan

32. In or about 2009, DOUGLAS SAILORS formed the Douglas W. Sailors' Defined Benefit Pension Plan. The purpose of a defined benefit plan is for an individual or an entity to contribute to a retirement plan while they work and to preserve and increase the amounts contributed by making prudent investments, in order for the individual to be able to utilize those funds after retirement.

### L. Political Action Committees

33. A political action committee (hereinafter "PAC") is an organization that pools campaign contributions from donors and donates those funds to campaigns for or against candidates, ballot initiatives, legislation, ideological missions and single interest groups.

34.     PACs can be established by the filing of a form with the Federal Election Commission (FEC) that principally identifies the PAC's name, physical address, email address, internet website and association with a banking institution.

35.     The FEC is an agency of the U.S. Government responsible for regulating, among other things, political committees funded to support candidates for federal elected office and political candidates through fundraising and expenditures.  The FEC is responsible for receiving and making available to the public specific, accurate information about the amounts and sources of political contributions.

36.     Each PAC is required to file a statement of organization which contains information including the name, address, and type of committee and the name and address of the treasurer of the committee.

37.     Unlike charities, PACs are not regulated by the Offices of the State Attorney General, nor are they subject to reporting requirements and/or scrutiny by the State Attorney Generals.

38.     Defendant SAILORS established the PACs used in the above-described charity solicitation call centers to solicit donations.  The same solicitation procedures and mechanisms were used to solicit funds.

39.     Defendant SAILORS caused the establishment of a purported PAC management company, Management International, Inc., as a mechanism to fraudulently access the donations.

40.     Defendant SAILORS solicited individuals to act as president and/or treasurer of the PACs, including defendant SAILORS' family members. Defendant SAILORS selected these individuals based upon their inexperience and willingness to comply with defendant SAILORS' instructions.

41.     At the direction of defendant Sailors, PACs were established, including the National Assistance Committee, which does business as the National Breast Cancer Committee, the National Firefighter's Committee, the National Troopers and Police Committee, and the National Veteran's Committee.

42.     The officers and agents of the PACs were nominees solicited by defendant Sailors to conceal his participation in the fraudulent activity.

## COUNT ONE

### Conspiracy to Commit Mail Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

2.     Beginning at least in or about 2009 and continuing through in or about 2018, in Broward County, in the Southern District of Florida and elsewhere, the defendant,

**DOUGLAS SAILORS,**

knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the Grand Jury to commit an offense against the United States, that is,

a.     to devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing, and attempting to execute, such scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly cause to be delivered by United States mail and by commercial interstate carrier according to the directions thereon, certain matters and things, in violation of Title 18, United States Code, Section 1341 (Mail Fraud); and

b. to devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

## PURPOSE AND OBJECTIVE OF THE CONSPIRACY

3. It was the purpose and objective of the conspiracy that the defendant and his co-conspirators would unlawfully enrich themselves by controlling the officers and boards of directors of the Charities and the PACs so that they could direct the transfer and payment of monies which had been donated to the Charities and the PACs to businesses owned or controlled by the defendant or his co-conspirators; and to conduct acts of obstruction and concealment in order to enable the scheme to continue.

All in violation of Title 18, United States Code, Section 1349.

## MANNER AND MEANS

A. **Forming the Charities for the Defendant's Personal Benefit**

4. Defendant SAILORS facilitated the creation and establishment of the Charities and management companies and, in so doing, he used nominees in order to conceal his true control over the activities of the Charities and management companies.

5. In order to maintain control of the Charities, defendant SAILORS hand-picked individuals known to him to be inexperienced and uninformed in the operation and management

of charities, to serve as officers and board members of the Charities. Defendant SAILORS made false statements to these individuals about his background and experience.

6.      Defendant SAILORS had ultimate responsibility for decisions made on behalf of the Charities and exercised unfettered control over the affairs of the Charities for his personal benefit and in furtherance of the fraud scheme.

7.      Defendant SAILORS drafted the mission statements for many of the Charities in order to fraudulently make the Charities appear to be engaged in legitimate socially beneficial activities.  The mission statements were designed to appeal to donor's compassion and goodwill. The mission statements were further designed to allow defendant SAILORS to obtain gifts-in-kind in order to corruptly increase the Ratio of the Charities' donations.

8.      Defendant SAILORS hired an accountant and bookkeeper for the Charities but engaged in activities through interstate wire and electronic communications designed to conceal from them and others the fraudulent nature of his conduct.

9.      Defendant SAILORS hired the Charity Solicitor without conducting any due diligence regarding the propriety of the Charity Solicitor's fees.   The Charity Solicitor directed the employees to place telephone solicitation calls to individuals throughout the United States. The telephone solicitors utilized a script written by the Charity Solicitor in order to solicit donations.

10.      Defendant SAILORS exercised complete control over the officers and directors of the Charities to such an extent that the officers and directors of the Charities failed to exercise their fiduciary duty to provide oversight, control, direction, operation, and supervision of the Charities.

11.    In the absence of independent and informed officers and board members, defendant SAILORS defrauded the Charities by using the Charities for his personal benefit and not in accordance with applicable state laws and not for the benefit of the public.

B.    **Utilizing Management Companies to Defraud**

12.    Defendant SAILORS established and controlled FUM, ACM, and HMDM (hereinafter collectively referred to as the "Management Companies"). Defendant SAILORS utilized nominees, including the Nominee President and Individual 1, in order to conceal his participation in the Management Companies. Defendant SAILORS also utilized the Nominee President to insulate himself from inquiries regarding the operation of the Charities by federal and state agencies.

13.    Defendant SAILORS directed the Charities to enter into contracts with the Management Companies. These contracts were prepared by Defendant SAILORS. In these contracts, the Charities agreed to pay management fees to the Management Companies of $30,000 a month or more for the services of the Management Companies. At the direction of defendant SAILORS, the officers and directors of the Charities approved and executed the management contracts and paid the management fees without any negotiations and without exercising any due diligence or considering any other options.

14.    The Nominee President and Individual 1 performed few, if any, services for the Management Companies and only at the direction of defendant SAILORS. The Nominee President was paid a fee of several thousand dollars per month to allow the Nominee President's name to be used as the alleged president of ACM and to perform ministerial duties, such as forwarding mail, including inquiries from various Attorney General offices, and any telephone inquiries. At the direction of defendant SAILORS, Individual 1 received a salary of $5,000 per month, even though

she provided almost no services for the Management Companies, and continued to receive this salary for a period after she was no longer an officer and had no association with ACM.

15.    The substantial fees paid by the Charities to the Management Companies owned and controlled by defendant SAILORS were used to fund his lavish lifestyle including a boat, luxury cars, and the rental and purchase of luxury homes. Defendant SAILORS also falsely informed the Charities' bookkeeper that the daily expenses incurred by defendant SAILORS and Individual 1, such as expensive meals and entertainment activities were business expenses incurred on behalf of the Charities.

C.    **Reasonableness of Management Fees and Opinion Letters**

16.    The management fees paid by the Charities to the companies owned and controlled by defendant SAILORS were $30,000 a month or more. The Charities' tax preparer and the agencies responsible for the regulation of charitable organizations began to question the reasonableness of these management fees. Defendant SAILORS hired corrupt accountants and lawyers to issue fraudulent and deceptive opinion letters stating that the fees paid to the Management Companies by the Charities were reasonable. Defendant SAILORS drafted and prepared the false and fraudulent opinion letters.

i.    **Accountant 1**

17.    In or about 2012, defendant SAILORS solicited an accountant (hereinafter referred to as "Accountant 1") to issue a false opinion letter stating that the management fees paid by DVS to FUM during 2011 were reasonable.

18.    Defendant SAILORS paid Accountant 1 approximately $500 for the issuance of the opinion letter.

19.     In order to facilitate the preparation of the false opinion letter, defendant SAILORS sent a draft of an opinion letter for Accountant 1 and edited the opinion letter drafted by Accountant 1.

20.     In or about 2016, defendant SAILORS again asked Accountant 1 to issue a false opinion letter regarding the reasonableness of the management fees paid by CCAI during 2016 to ACM. Defendant SAILORS caused the Charities to pay Accountant 1 approximately $600 for the issuance of this second opinion letter.

21.     Accountant 1 signed the opinion letters understanding that the opinion letters contained false statements regarding the alleged reasonableness of the fees charged by the alleged management companies to the Charities.

22.     Defendant SAILORS did not tell Accountant 1 what the opinion letters were to be used for, but Accountant 1 knew it was for "something fishy." Instead, Defendant SAILORS utilized the opinion letters of Accountant 1 to mislead the tax preparer regarding the reasonableness of the management fees.

ii     **Attorney 1**

23.     In or about 2013, defendant SAILORS solicited an attorney (hereinafter referred to as "Attorney 1") to issue a false opinion letter stating that the management fees paid by DVS to FUM during 2012 were reasonable.

24.     Defendant SAILORS agreed to pay Attorney 1 approximately $3,000 for the issuance of the false opinion letter and other matters.

25.     In order to facilitate the preparation of the false opinion letter, defendant SAILORS sent a copy of the opinion letter previously issued by Accountant 1, which Attorney 1 redrafted.

26.     Defendant SAILORS directed Attorney 1 to falsely state that the opinion letter was issued at the request of the president of DVS.

27.     In or about December 2014, defendant SAILORS requested that Attorney 1 issue two additional false opinion letters regarding the reasonableness of the management fees paid by DVS to ACM during 2014 and CCAI to ACM during 2014.

28.     Attorney 1 signed the opinion letters understanding that the opinion letters contained false statements regarding the reasonableness of the fees charged by the alleged management companies to the Charities.

29.     Attorney 1 was told by defendant SAILORS that the opinion letters of Attorney 1 were for the files and never to be used in any capacity. Instead, the opinion letters were used to mislead the tax preparer and the bookkeeper for DVS and the Internal Revenue Service which was auditing DVS.

### iii.     Attorney 2

30.     In or about 2017, defendant SAILORS solicited an attorney (hereinafter referred to as "Attorney 2") to issue a false opinion letter stating that the management fees paid by CCAI to ACM during 2015 were reasonable.

31.     Defendant SAILORS agreed to pay Attorney 2 approximately $3,200 for the issuance of the false opinion letter and other matters.

32.     In order to facilitate the preparation of the false opinion letter, defendant SAILORS sent a copy of the opinion letter previously issued by Attorney 1, which Attorney 2 copied almost verbatim.

33.     Defendant SAILORS directed Attorney 2 to falsely state that the opinion letter was issued at the request of the president of CCAI.

34.   Attorney 2 signed the opinion letter understanding that the opinion letter contained false statements regarding the alleged reasonableness of the fees charged by the alleged management company to the Charities.

35.   Attorney 2 was told by defendant SAILORS that the opinion letter was to be utilized for the CCAI's annual state registration filings.   Instead, the opinion letter of Attorney 2 was used to mislead others regarding the reasonableness of the management fees, including the tax preparer.

iv.   **Accountant 2**

36.   In or about 2018, defendant SAILORS solicited an accountant (hereinafter referred to as "Accountant 2") to issue a false opinion letter stating that the management fees paid by CCAI during 2016 were reasonable.  Defendant SAILORS needed the opinion letter due to an ongoing lawsuit filed by the Florida Attorney General alleging fraud in the operation of CCAI and its officers and directors.

37.   Defendant SAILORS agreed to pay Accountant 2 approximately $5,000 for the issuance of the false opinion letter.

38.   Accountant 2 signed the opinion letters understanding that the opinion letters contained false statements regarding the alleged reasonableness of the fees charged by the alleged management company.

39.   Accountant 2 understood that defendant SAILORS utilized the opinion letter of Accountant 2 to mislead the Florida Attorney General and others regarding the reasonableness of the management fees, including the tax preparer and the bookkeeper for CCAI, other state agencies investigating CCAI, and the officers and directors of CCAI.

D.     <u>Other Fraudulent Acts by Defendant Sailors and Attorney 1</u>

40.     In or about 2014, the IRS conducted a civil audit of DVS. Defendant SAILORS hired Attorney 1 to obstruct the investigation and ensure that the IRS did not receive truthful information regarding the operations of DVS.

41.     In or about 2016, when CCAI was being sued in a civil matter by a third party, defendant SAILORS paid Attorney 1 to fraudulently pose as the compliance officer for CCAI in order to obstruct the lawsuit brought against the charity. As defendant SAILORS well knew, Attorney 1 was never the compliance officer for CCAI and had no knowledge of the day-to-day operations of CCAI. At the request of defendant SAILORS, Attorney 1 provided fraudulent testimony in two civil depositions, under oath and penalties of perjury.

E.     <u>Gifts-In-Kind</u>

42.     Of the total cash donations received by the Charities, only approximately ½ to 1 percent was distributed to further the stated mission of the Charities. Most of the money donated by the public was paid to the Charity Solicitor or to the Management Companies controlled by SAILORS. Defendant SAILORS used the money paid to the Management Companies for his personal gain.

43.     In furtherance of the scheme to defraud, defendant SAILORS wanted to increase the perceived percentage of the Charities' distributions since a low distribution Ratio could have a negative effect on cash donations.

44.     One way to increase the distribution Ratio was through the use of gifts-in-kind. Beginning in or about 2009, defendant SAILORS negotiated agreements on behalf of the Charities whereby the Charities would substantially increase their Ratio by paying a co-conspirator broker

(hereinafter referred to as the "Gifts-In-Kind Broker") to ship goods to other charities in the United States and in foreign countries.

45. Defendant SAILORS and the Gifts-In-Kind Broker knew that the Charities could only increase their ratio: if the Charities took actual possession and control of the goods; the Charities actually selected the recipients of the goods; and the goods conformed to the mission of the Charities.

46. Defendant SAILORS and the Gifts-In-Kind Broker fraudulently increased the Charities' Ratios by falsely reporting the gifts-in-kind on the tax returns of the Charities even though the Charities never took possession and control of the goods.

47. In furtherance of the fraud, the Gifts-In-Kind Broker and defendant SAILORS, selected the actual beneficiaries of the charitable gifts (*i.e.*, foreign hospitals), without regard to public benefit and solely to facilitate the fraudulent scheme. The foreign hospitals were selected by the Gifts-In-Kind-Broker based upon their willingness to accept the goods without question or scrutiny and regardless of medical need.

48. Defendant SAILORS and the Gifts-In-Kind Broker agreed to ship goods to places and for purposes that were not in furtherance of the mission of the charity, such as shipping goods to Sierra Leone, Africa on behalf of DVS, allegedly in support of disabled veterans, in order to falsely increase the Ratio.

49. Defendant SAILORS, in order to increase the Ratio, would request that the Gifts-In-Kind Broker ship certain goods, such as pharmaceuticals, outside the United States on behalf of the Charities, as such goods would cause a large increase in the Ratio.

50. In exchange for his participation in the fraud, the Gifts-In-Kind Broker received thousands of dollars in payments from the Charities, as directed by defendant SAILORS.

### F.   Disbursement of Charity Funds

51.     In order to create the appearance of legitimacy, defendant SAILORS understood that some amount of funds fraudulently obtained by the charities would have to be donated each year to charity recipients. In furtherance thereof, defendant SAILORS directed the charity president to research and select well known medical and academic institutions. Pursuant to the scheme to defraud, defendant SAILORS determined the amount of charity funds to be donated to such institutions based upon the amount of funds remaining in the charities' bank accounts at the end of the year.  Defendant SAILORS approved the donation of funds only after ensuring that there would be sufficient funds to pay his management fees.

### G.   Nominee Corporations and Trusts

52.     Defendant SAILORS caused the establishment of HMDM, a purported charity management company used to further the fraudulent activities and to conceal defendant SAILORS' receipt of criminal proceeds.  Defendant SAILORS also caused the establishment of the SO Trust and Palmer Trust in order to conceal his ownership of HMDM.

### H.   Nurse Placement International (NPI)

53.     In or about 2016, the Gifts-In-Kind Broker suggested to defendant SAILORS that CCAI contribute cash directly to a cancer hospital in the Dominican Republic (hereinafter referred to as the "Cancer Hospital") to pay the salaries of nurses in order to make the Charities appear more legitimate and substantial.

54.     The Gifts-In-Kind Broker told defendant SAILORS that the cost of each nurse was approximately $300 - $400 per month, and the two agreed that the Gifts-In-Kind Broker would be paid $700 per month for his assistance.  Defendant SAILORS and the Gifts-In-Kind Broker agreed that defendant SAILORS would tell the officers and directors of CCAI to pay for four nurses for

the Cancer Hospital. The total monthly cost of this expense was $1600 for the nurses and $700 for the Gifts-In-Kind Broker.

55.     Defendant SAILORS told the officers and directors of CCAI that CCAI needed to pay $12,000 to NPI for four nurses at the Cancer Hospital.

56.     HMDM conducted business under the fictitious name NPI. Defendant SAILORS did not inform the officers and directors of CCAI that NPI was a fictitious name for HMDM. HMDM is owned by the SO Trust and Palmer Trust. Defendant SAILORS and Individual 1 are the beneficiaries of these trusts.

57.     Beginning in or about mid-2016, pursuant to the instructions of defendant SAILORS, the officers and directors of CCAI agreed to pay $12,046 to NPI on a monthly basis. In exchange, the Gifts-In-Kind Broker forwarded monthly reports detailing the hours the nurses worked to defendant SAILORS. Each month thereafter, CCAI paid NPI approximately $12,000. At the direction of defendant SAILORS, the accountant for NPI then issued a check from NPI to HMDM for $12,000. From this amount, HMDM paid monthly $400 per nurse (four nurses $1,600) to the Cancer Hospital and $700 to the Gifts-In-Kind Broker. Defendant SAILORS, through HMDM, and unbeknownst to the CCAI officers and directors, retained the remaining funds of approximately $9,700 per month as a management fee.

58.     Other than receiving, via email, the weekly time reports for the Cancer Hospital nurses from the Gifts-In-Kind Broker, neither defendant SAILORS nor HMDM performed any other service on behalf of NPI in return for the $9,700 monthly fee.

59.     In or about September 2016, defendant SAILORS decided that CCAI should pay for 8 nurses at the Cancer Hospital at a cost of $500 per nurse per month. Based on the increase in the number of nurses, defendant SAILORS directed the officers and directors of CCAI to raise

the fee paid to NPI for the nurses from $12,046 to $24,092, based upon the fraudulent pretense that the additional money was needed to cover the increased monthly salary of the eight nurses.

60.     Each month thereafter, CCAI paid NPI $24,092.  At the direction of defendant SAILORS, the accountant for NPI then issued a check from NPI to HMDM for $24,092.  From this amount, HMDM paid monthly $500 per nurse (eight nurses $4,000) to the Cancer Hospital and $700 to the Gifts-In-Kind Broker.  Defendant SAILORS, through HMDM, and without the knowledge of the CCAI officers and directors, retained the remaining funds of approximately $19,000 per month.  Neither defendant SAILORS nor the management company HMDM performed any other service on behalf of NPI in return for the $19,000 monthly fee.

61.     During the approximate two-year time frame CCAI paid for nurses at the Cancer Hospital as part of its charitable mission, the nurses received a total of $53,000 for their work.  The Gifts-In-Kind Broker received $9,700.  HMDM, the management company owned by defendant SAILORS through his trusts, received over $450,000.

I.     **Obstruction**

62.     Defendant SAILORS attempted to obstruct both the federal criminal investigation and the civil investigation of the Florida Attorney General by means of fraud and the facilitation of false and perjurious testimony.

63.     Defendant SAILORS attempted to influence a witness to falsely state, among other things, that the officer and/or director sought out other management companies but could not find any other management companies offering the services of ACM.

64.     Defendant SAILORS attempted to influence a witness by falsely stating to a witness, among other things, that any instructions conveyed by defendant SAILORS were as a result of instructions given by the officers of the Charities.

65.    Defendant SAILORS attempted to indirectly influence a witness by having a person state to the witness that the witness should not mention defendant SAILORS at the deposition, and that all matters of the Charities were reviewed and discussed with counsel.

66.    After being contacted by the Attorney General's Offices from various states, defendant SAILORS instructed persons to obstruct their inquiries by being unresponsive to the document requests.

### J.    Forming and Managing PACs to Facilitate the Fraud

67.    In order to circumvent the scrutiny of the State Attorney General Offices that regulate charities, and to continue and to facilitate the scheme to defraud, defendant SAILORS established several PACs.

68.    Defendant SAILORS understood that the PAC's were not subject to the scrutiny and regulations concerning charities.

69.    Defendant SAILORS used the pre-existing manner and means of the charity fraud to establish and operate fraudulent PACs, such as the above-described nominee officials, call center solicitations and alleged consulting and management companies.

70.    Defendant SAILORS solicited the above-described Attorney 2 to act in the capacity of PAC president based upon Attorney 2's inexperience and willingness to comply with the instructions of defendant SAILORS.

71.    Defendant SAILORS use of the PACs to continue the scheme to defraud was a mechanism to conceal defendant SAILORS' participation therein and to generate large amounts of criminally generated funds.

K.    Use of Fraud Proceeds

72.    Defendant SAILORS used the proceeds from the fraud to fund his lavish lifestyle. From 2013 through 2018, defendant SAILORS also made approximately $1,125,000 in contributions to his defined benefit pension plan from the proceeds of the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO - FOUR

### GENERAL ALLEGATIONS

A.    Unlawfully Dissipating Assets of his Defined Benefit Plan

1.    In order to encourage persons to plan for retirement, the Internal Revenue Code provides a tax deduction, up to certain limits, for amounts contributed to a defined benefit pension plan.

2.    In order to prevent the contributions to the defined benefit plan from being dissipated, the Internal Revenue Code prohibits persons from dealing with the income or assets of a plan in their own self-interest. The Internal Revenue Code limits loans from the plan and provides strict rules that govern such loans.

3.    Each year a defined benefit plan must file a Form 5500 with the IRS, which sets forth, among other items, the contributions made or to be made to the plan, the assets and liabilities of the plan, the loans made to and from the plan, and whether the plan has made any prohibited transactions.

4.    From in or about 2013 through 2018, defendant SAILORS employed a firm to manage the plan and prepare the Form 5500 for his signature. In order to administer the plan and accurately report on the Form 5500 contributions made to the plan along with distributions or loans

withdrawn from the plan, each year the firm sent defendant SAILORS a questionnaire, which defendant SAILORS completed and signed.

5.   From 2013 through 2018, defendant SAILORS deducted approximately $1,125,000 in contributions to his defined benefit pension plan on his individual federal income tax return.

6.   Each year after making the contributions defendant SAILORS unlawfully withdrew some or all of the funds.

7.   Each year, Defendant SAILORS was sent a questionnaire by the plan administrator for Defendant SAILORS' defined benefit pension plan. The questionnaire was utilized by the plan administrator in order to accurately report all financial aspects of the plan, including contributions and distributions from the plan to the IRS through a Form 5500, Annual Return of One-Participant Retirement Plan. Defendant SAILORS falsely completed the questionnaire by stating, amongst other false statements, the following:

a.   that he did not control or manage any other business, when, in fact defendant SAILORS controlled and managed DVS, CCAI, FUM, HMDM, and NCA;

b.   that there were no participant loans during the plan year, when in fact, defendant SAILORS made hundreds of thousands of dollars of loans and/or distributions to or for himself from the plan;

c.   that no plan investment transaction involved a party-in-interest, when in fact, many of the investments involved loans to himself or companies he owned or had an interest in, including HMDM;

d.   that no loans were in default or uncollectible at the plan year-end, when in fact, most of the loans were uncollectible;

e.     defendant SAILORS falsely listed the nature, character, and amount of the plan assets on the plan asset summary;

f.     defendant SAILORS falsely stated the actual amount that he contributed to the plan; and

g.     defendant SAILORS falsely signed the first page of the questionnaire by stating that he provided "complete and accurate data."

8.     By providing false information to the plan administrator through the questionnaire, defendant SAILORS caused the plan administrator to prepare a false Form 5500 which was then signed under penalties of perjury by defendant SAILORS and filed with the IRS.

9.     Through numerous unlawful transactions, including his unreported self-dealing and engaging in otherwise prohibited transactions, defendant SAILORS dissipated the assets of the defined benefit plan to approximately $201,327 as of December 31, 2017.

## COUNT TWO

(Subscribing to a False Tax Return)

(26 U.S.C. § 7206(1))

1.     The General Allegations Section of Counts Two through Four is hereby re-alleged and expressly incorporated as if set forth herein.

2.     On or about October 13, 2016, in Broward County, in the Southern District of Florida and elsewhere, the defendant,

**DOUGLAS SAILORS,**

a resident of Parkland, Florida, did willfully make and subscribe to a United States Individual Income Tax Return, Form 1040, for tax year 2015, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. Within the Form 1040, which was filed with the Internal Revenue

Service, the defendant failed to report as gross income amounts withdrawn from the Douglas W. Sailors' Defined Benefit Pension Plan and falsely claimed as deductions from gross income alleged contributions to the Douglas W. Sailors' Defined Benefit Pension Plan, and thus understated the amount of adjusted gross income and tax due and owing.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT THREE

(Subscribing to a False Tax Return)
**(26 U.S.C. § 7206(1))**

1.      The General Allegations Section of Counts Two through Four is hereby re-alleged and expressly incorporated as if set forth herein.

2.      On or about October 11, 2017, in Broward County, in the Southern District of Florida and elsewhere, the defendant,

### DOUGLAS SAILORS,

a resident of Parkland, Florida, did willfully make and subscribe to a United States Individual Income Tax Return, Form 1040, for tax year 2016, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. Within the Form 1040, which was filed with the Internal Revenue Service, the defendant failed to report as gross income amounts withdrawn from the Douglas W. Sailors' Defined Benefit Pension Plan and falsely claimed as deductions from gross income alleged contributions to the Douglas W. Sailors' Defined Benefit Pension Plan, and thus understated the amount of adjusted gross income and tax due and owing.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT FOUR

(Subscribing to a False Tax Return)
**(26 U.S.C. § 7206(1))**

1.     The General Allegations Section of Counts Two through Four is hereby re-alleged and expressly incorporated as if set forth herein.

2.     On or about October 15, 2018, in Broward County, in the Southern District of Florida and elsewhere, defendant,

### DOUGLAS SAILORS,

a resident of Parkland, Florida, did willfully make and subscribe to a United States Individual Income Tax Return, Form 1040, for tax year 2017, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  Within the Form 1040, which was filed with the Internal Revenue Service, the defendant failed to report as gross income amounts withdrawn from the Douglas W. Sailors' Defined Benefit Pension Plan and falsely claimed as deductions from gross income alleged contributions to the Douglas W. Sailors' Defined Benefit Pension Plan, and thus understated the amount of adjusted gross income and tax due and owing.

In violation of Title 26, United States Code, Section 7206(1).

### FORFEITURE ALLEGATION
### Conspiracy to Commit Mail Fraud and Wire Fraud

1.     Upon conviction of Count 1, an offense in violation of Title 18, United States Code, Section 1349, the defendant, DOUGLAS SAILORS, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation. The property to be forfeited includes, but is not limited to, the following:

A. The sum of $22,000,000, which represents the amount of proceeds which constitutes or was derived from Count 1 of this Indictment; and

B. The residence located at 1718 Griffith Avenue, Owensboro, Kentucky, 42301-3507 further described as Lots No 5 and 6 in Block A in what is known as the Griffithdale Subdivision to the City of Owensboro, Kentucky, a plat of which subdivision is of record in said Clerk's Office in Deed Book 112 at page 449.

2.      If any of the property described above, as a result of any act or omission of defendant DOUGLAS SAILORS,

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

then the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

_for_ J. VAGLIENTI
JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY

JEFFREY KAPLAN
ASSISTANT UNITED STATES ATTORNEY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**      **DOUGLAS SAILORS**

**Case No:** _____

Counts #: 1

Conspiracy to Commit Mail Fraud and Wire Fraud

Title 18, United States Code, Section 1349
* **Max. Penalty:** 20 years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:** 3 years'
* **Max. Fine:** the greater of $250,000 fine or twice the amount of gross gain or gross loss

Counts #: 2-4

Subscribing to a False Tax Return

Title 26, United States Code, Section 7206(1)
* **Max. Penalty:** 3 years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:** 1 year
* **Max. Fine:** $250,000

*Refers only to possible term of incarceration, supervised release and fines. It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.



# Case Assignment
# Standard Magistrate Assignment

Case number **4:22MJ-68**

Note: Judge determined by charging documentation.

Assigned on 11/4/2022 10:25:41 AM
Transaction ID: 70484

Return

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

---

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **PLAINTIFF** | ) | **Criminal Action No. 4:22mj-00068-HBB** |
| v. | ) | H. BRENT BRENNENSTUHL, |
| | ) | Magistrate Judge |
| **DOUGLAS SAILORS** | ) | |
| | ) | |
| **DEFENDANT** | ) | |
| | ) | |

---

## ORDER

On the 4TH day of November 2022, this action came before the undersigned upon Defendant's initial appearance after execution of an arrest warrant issued by the Southern District of Florida, Case Number: 22-60210-CR-Singhal/Damian. There appeared the Defendant, Douglas Sailors, in custody of the Federal Bureau of Investigations, via video/audio conference in Owensboro. Assistant United States Attorney Mark J. Yurchisin, II, was present, in person, for the United States of America. The proceedings were digitally recorded. The Defendant was advised of his right to appear in person before the Magistrate Judge and the Defendant gave oral Consent to Proceed by Video Teleconference.

The Defendant acknowledged receipt of the Indictment and acknowledged an understanding of the charges contained therein. The Defendant was advised of his Constitutional rights including his right to be represented by counsel. The Defendant advised the Court he is attempting to retain counsel in this matter and therefore waives his right to Court-appointed counsel. The Defendant executed a waiver to that effect.

The Defendant was advised of his rights with respect to Rule 5 proceedings as well as his right to request transfer of the proceedings to this District pursuant to Rule 20 of the Federal Rules of Criminal Procedure to plead guilty as to the charges.

Counsel for the United States advised the Court the United States is not seeking detention in this action but is requesting Defendant be released on a $250,000.00 secured property bond.

The Court having reviewed the charges and having heard the recommendation of the United States and being otherwise sufficiently advised,

**IT IS ORDERED** the Defendant shall be released on a $250,000.00 secured property bond pending the trial of this action.

**IT IS FURTHER ORDERED** the Southern District of Florida will schedule Defendant to appear for arraignment.

ENTERED this November 4, 2022

**H. Brent Brennenstuhl**
**United States Magistrate Judge**

Copies to:     AUSA Mark J. Yurchisin, II
               United States Probation
               United States Marshal Service
               US District Court, Southern District of Florida at Miami

0|18

AO 98 (Rev. 12/11) Appearance Bond

# UNITED STATES DISTRICT COURT
### for the
Western District of Kentucky

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 4:22mj-68-HBB |
| DOUGLAS SAILORS | ) |
| *Defendant* | ) |

## APPEARANCE BOND

### Defendant's Agreement

I, Douglas Sailors _____ *(defendant)*, agree to follow every order of this court, or any court that considers this case, and I further agree that this bond may be forfeited if I fail:

( X )    to appear for court proceedings;
( X )    if convicted, to surrender to serve a sentence that the court may impose; or
( X )    to comply with all conditions set forth in the Order Setting Conditions of Release.

### Type of Bond

(    ) (1)  This is a personal recognizance bond.

(    ) (2)  This is an unsecured bond of $ _____ .

( X ) (3)  This is a secured bond of $ 250,000.00 _____ , secured by:

   (    ) (a) $ _____ , in cash deposited with the court.

   ( X ) (b) the agreement of the defendant and each surety to forfeit the following cash or other property *(describe the cash or other property, including claims on it — such as a lien, mortgage, or loan — and attach proof of ownership and value)*:
   Home in Owensboro

   If this bond is secured by real property, documents to protect the secured interest may be filed of record.

   (    ) (c) a bail bond with a solvent surety *(attach a copy of the bail bond, or describe it and identify the surety)*:

### Forfeiture or Release of the Bond

*Forfeiture of the Bond.* This appearance bond may be forfeited if the defendant does not comply with the above agreement. The court may immediately order the amount of the bond surrendered to the United States, including the security for the bond, if the defendant does not comply with the agreement. At the request of the United States, the court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

AO 98 (Rev. 12/11) Appearance Bond

*Release of the Bond.* The court may order this appearance bond ended at any time. This bond will be satisfied and the security will be released when either: (1) the defendant is found not guilty on all charges, or (2) the defendant reports to serve a sentence.

### Declarations

*Ownership of the Property.* I, the defendant – and each surety – declare under penalty of perjury that:

(1) all owners of the property securing this appearance bond are included on the bond;
(2) the property is not subject to claims, except as described above; and
(3) I will not sell the property, allow further claims to be made against it, or do anything to reduce its value while this appearance bond is in effect.

*Acceptance.* I, the defendant – and each surety – have read this appearance bond and have either read all the conditions of release set by the court or had them explained to me. I agree to this Appearance Bond.

I, the defendant – and each surety – declare under penalty of perjury that this information is true. (See 28 U.S.C. § 1746.)

Date: 11/4/22

x _____
Defendant's signature

Douglas W. Spillers
Surety/property owner – printed name

_____ Nov 4, 2022
Surety/property owner – signature and date

Jamie L O'Bryan
Surety/property owner – printed name

_____ 11-4-2022
Surety/property owner – signature and date

_____
Surety/property owner – printed name

_____
Surety/property owner – signature and date

CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

Date: 11/4/22

Approved.

Date: 11/4/22

_____
Judge's signature

AO 199A (Rev. 12/11)  Order Setting Conditions of Release

# UNITED STATES DISTRICT COURT
for the
Western District of Kentucky

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| | ) Case No.  4:22mj-68-HBB |
| DOUGLAS SAILORS | ) |
| *Defendant* | ) |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1)   The defendant must not violate federal, state, or local law while on release.

(2)   The defendant must cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a.

(3)   The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4)   The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at:   U.S. District Court, Southern District of Florida at Miami
*Place*

DATE TO APPEAR IS TO BE DETERMINED AND DEFENDANT WILL BE NOTIFIED

on _____
*Date and Time*

If blank, defendant will be notified of next appearance.

(5)   The defendant must sign an Appearance Bond, if ordered.

## ADDITIONAL CONDITIONS OF RELEASE

Pursuant to 18 U.S.C. § 3142(c)(1)(B), the court may impose the following least restrictive condition(s) only as necessary to reasonably assure the appearance of the person as required and the safety of any other person and the community.

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( ☐ ) (6) The defendant is placed in the custody of:

Person or organization _____

Address *(only if above is an organization)* _____

City and state _____  Tel. No. _____

who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: _____  _____

Custodian  Date

( ☑ ) (7) The defendant must:

( ☐ ) (a) submit to supervision by and report for supervision to the _____,

telephone number _____, no later than _____.

( ☐ ) (b) continue or actively seek employment.

( ☐ ) (c) continue or start an education program.

( ☑ ) (d) surrender any passport to:  US Probation Officer in Owensboro

( ☐ ) (e) not obtain a passport or other international travel document.

( ☐ ) (f) abide by the following restrictions on personal association, residence, or travel: _____

( ☐ ) (g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: _____

( ☐ ) (h) get medical or psychiatric treatment: _____

( ☐ ) (i) return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purposes: _____

( ☐ ) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.

( ☐ ) (k) not possess a firearm, destructive device, or other weapon.

( ☐ ) (l) not use alcohol ( ☐ ) at all ( ☐ ) excessively.

( ☐ ) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

( ☐ ) (n) submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

( ☐ ) (o) participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

( ☐ ) (p) participate in one of the following location restriction programs and comply with its requirements as directed.

( ☐ ) (i) **Curfew.** You are restricted to your residence every day ( ☐ ) from _____ to _____, or ( ☐ ) as directed by the pretrial services office or supervising officer; or

( ☐ ) (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or

( ☐ ) (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court; or

( ☐ ) (iv) **Stand Alone Monitoring.** You have no residential curfew, home detention, or home incarceration restrictions. However, you must comply with the location or travel restrictions as imposed by the court.
**Note:** Stand Alone Monitoring should be used in conjunction with global positioning system (GPS) technology.

AO 199C  (Rev. 09/08)  Advice of Penalties

Page _____ of _____ Pages

## ADVICE OF PENALTIES AND SANCTIONS

**TO THE DEFENDANT:**

**YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:**

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year.  This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court.  The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed.  If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more – you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony –  you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor –  you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive.  In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release.  I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed.  I am aware of the penalties and sanctions set forth above.

X _____
_____ *Defendant's Signature*

Owensboro, KY
_____ *City and State*

### Directions to the United States Marshal

( ✔ ) The defendant is ORDERED released after processing.
(   ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release.  If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: 11/4/22 _____

_____ *Judicial Officer's Signature*

H. BRENT BRENNENSTUHL, US Magistrate Judge
_____ *Printed name and title*

DISTRIBUTION:   COURT    DEFENDANT    PRETRIAL SERVICE    U.S. ATTORNEY    U.S. MARSHAL

DAVIESS COUNTY
**D926   PG813**

THIS DEED made and entered into on this the 15th day of November, 2013, by and between **John N. Boarman II and Kim Boarman**, husband and wife, of (REDACTED) ~ Owensboro KY 42303 , hereinafter called FIRST PARTIES, and **So Trust dated October 11, 2013**, whose mailing and **grantee in-care-of tax mailing address is:** (REDACTED) Lighthouse Pt FL 33064 , hereinafter called SECOND PARTY.

WITNESSETH: That for and in consideration of the sum of FIVE HUNDRED SEVENTY THOUSAND AND 00/100 DOLLARS, ($570,000.00), cash in hand paid by Second Party to First Parties, the receipt of which is hereby acknowledged, the First Parties have bargained and sold and do hereby GRANT AND CONVEY unto the Second Party, his or her heirs, and assigns forever, the following described property located in **Daviess County, Kentucky**, and more particularly described as follows, to-wit:

(Redacted) in what is known as the Griffithdale Subdivision to the City of Owensboro, Kentucky, a plat of which subdivision is of record in said Clerk's Office in Deed Book 112 at page 449.

AND BEING the same property conveyed to John N. Boarman, II and Kim Boarman, husband and wife, dated April 6, 2010, of record in Deed Book 874, Page 54 in the Office of the Daviess County Clerk.

After recording return to:
FOREMAN WATSON LAND TITLE, LLC
530 FREDERICA STREET
OWENSBORO, KENTUCKY 42301

DAVIESS COUNTY
**D926 PG814**

TO HAVE AND TO HOLD, the above-described real property, together with all the rights, privileges and appurtenances thereunto belonging, or in anywise appertaining, unto the Second Party, his or her heirs and assigns forever, with covenant of GENERAL WARRANTY.

This conveyance is made subject to all legal and existing restrictions, covenants, easements and rights-of-way which might in any manner affect the title of the property herein being conveyed, including all zoning regulations and ordinances.

Consideration Certificate: The parties hereto state and affirm the consideration reflected in this Deed is the full consideration paid for the real property conveyed herein. The Second Party joins this Deed for the sole purpose of certifying the consideration pursuant to KRS Chapter 382. The parties further certify their understanding that falsification of the stated consideration or sale price of the property is a Class D felony, subject to one to five years imprisonment and fines up to $10,000.00.

IN TESTIMONY WHEREOF, witness the signatures of the First Parties and Second Party herein, this the day and year first hereinabove written.

2

DAVIESS COUNTY
**D926    PG815**

FIRST PARTIES:

John N. Boarman II

Kim Boarman

STATE OF KENTUCKY

COUNTY OF DAVIESS

The foregoing Deed and Consideration Certificate was subscribed, sworn to and acknowledged before me this the 15th day of November, 2013, by John N. **Boarman II and Kim Boarman,** husband and wife, First Parties herein.

NOTARY PUBLIC: State-at-Large, KY

My Commission Expires: _____

Notary ID (if any): _____

exp. 5-19-2014

3

DAVIESS COUNTY
**D926  PG816**

SECOND PARTY:

So Trust dated October 11, 2013

_____
Douglas W. Sailors, Trustee

_____
Jamie L. O'Bryan, Trustee

STATE OF _Florida_

COUNTY OF _Broward_

The foregoing Consideration Certificate was subscribed, sworn to and acknowledged before me this the 13th/14th day of _November_, 2013, by **Douglas W. Sailors and Jamie L. O'Bryan, Trustees** of the So Trust dated **October 11, 2013**, Second Party herein.

ANTHONY D. SCIORTINO
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE830118
Expires 8/26/2016

_____
NOTARY PUBLIC: _Anthony D Sciortino_
My Commission Expires: _8/26/2016_
Notary ID (if any): _____

Prepared by:

Foreman Watson Holtrey, LLP

_____
James S. Watson
530 Frederica Street
Owensboro, Kentucky 42301
270-689-2412

4

When Recorded Return to:
Indecomm Global Services
As Recording Agent Only
1260 Energy Lane
St. Paul, MN 55108

Return To:
Title Source, Inc.
662 Woodward Avenue
Detroit, MI 48226

Order Number:
62447806
3830060

80578716

DAVIESS COUNTY
**D983   PG665**

## QUITCLAIM DEED

**THIS DEED OF CONVEYANCE** made and entered into on this 14th day of December , 20 16 , by and between **DOUGLAS W. SAILORS and JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013**, who acquired title as SO TRUST, DATED OCTOBER 11, 2013, of (REDACTED) , Owensboro, KY 42301-3507, hereinafter known and referred to as **GRANTOR**, and **DOUGLAS W. SAILORS and JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013**, of the above address, hereinafter known and referred to as **GRANTEE**.  The in-care-of tax mailing address for the current tax year is 1718 Griffith Avenue, Owensboro, KY 42301.

### W I T N E S S E T H :

For and in consideration of the sum of **One dollar ($1.00)**, cash in hand paid by Grantee to Grantor, the receipt of all of which is hereby acknowledged, the Grantor has bargained, sold, aliened, and conveyed, and does by these presents quitclaim unto the Grantee, **his or her heirs and assigns forever**, a certain tract of real estate more fully described as follows:

**Lots No. 5 and 6 in Block A, in what is known as the Griffithdale Subdivision to the City of Owensboro, Kentucky, a plat of which subdivision is of record in said clerk's office in Deed Book 112 at Page 449.**

**Subject to all legal roads, easements, and restrictions.**

**Being the same parcel conveyed to SO TRUST DATED OCTOBER 11, 2013 from JOHN N. BOARMAN II and KIM BOARMAN, by virtue of a Deed Dated November 15, 2013, recorded November 19, 2013, in Deed Book 926, Page 813, County of Daviess, State of Kentucky.**

**Assessor's Parcel No: 004-13-05-006-00-000**

It is agreed and understood by and between the parties hereto that all ad valorem taxes due and payable upon the above described real estate for and during the current

PAGE 1 of 4

DAVIESS COUNTY
D983   PG666

calendar year shall be prorated between the Grantor and Grantee as of the date of this Deed of Conveyance, and that all such taxes due and payable for and during all succeeding calendar years shall be paid by Grantee, and that possession of the subject real estate shall accompany delivery of this Deed of Conveyance.

**TO HAVE AND TO HOLD,** the above described tract of real estate, together with the improvements thereon and the appurtenances thereunto appertaining, aforementioned, unto the Grantee, **his or her heirs and assigns forever,** with no warranty of title whatsoever; SUBJECT, HOWEVER, to all easements, covenants and restrictions of record, or apparent from visual inspection.

**IN THIS CONSIDERATION CERTIFICATE,** the parties hereto do hereby certify, pursuant to KRS Section 382.135, that $570,000.00 is the estimated fair cash value for the property herein conveyed. We further certify our understanding that falsification of the stated consideration or sale price of the property is a Class D felony, subject to one to five years imprisonment and fines up to $10,000.00.

This space intentionally left blank.

PAGE 2 of 4

*Attached to and becoming a part of Deed between DOUGLAS W. SAILORS and JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013, who acquired title as SO TRUST, DATED OCTOBER 11, 2013, as Grantor(s), and DOUGLAS W. SAILORS and JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013, as Grantee(s).*

_____, Trustee
**DOUGLAS W. SAILORS, Trustees of the
SO TRUST, DATED OCTOBER 11, 2013**

_____, Trustee
**JAMIE L. O'BRYAN, Trustees of the
SO TRUST, DATED OCTOBER 11, 2013**

**Grantors**

COMMONWEALTH OF _Kentucky_       )
                                 )
COUNTY OF _Daviess_              )

The undersigned, a Notary Public within and for the State and County aforesaid, does certify that on this _14th_ day of _December_, 20_16_, the foregoing Deed of Conveyance and Consideration Certificate was produced to me and was signed, sworn to, acknowledged and delivered by **DOUGLAS W. SAILORS** and **JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013,** Grantors herein,

Dennis W. Sullivan
State At Large, Kentucky
Notary Public
Commission No. 557697
My Commission Expires 6/25/2020

Notary Public _Dennis W. Sullivan_
My Commission Expires _6.25.2020_

PAGE 3 of 4

*Attached to and becoming a part of Deed between DOUGLAS W. SAILORS and JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013, who acquired title as SO TRUST, DATED OCTOBER 11, 2013, as Grantor(s), and DOUGLAS W. SAILORS and JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013, as Grantee(s).*

_____, Trustee
**DOUGLAS W. SAILORS, Trustees of the
SO TRUST, DATED OCTOBER 11, 2013**

_____, Trustee
**JAMIE L. O'BRYAN, Trustees of the
SO TRUST, DATED OCTOBER 11, 2013**

**Grantees**

COMMONWEALTH OF *Kentucky*          )
                                    )
COUNTY OF *Daviess*                 )

     The undersigned, a Notary Public within and for the State and County aforesaid, does certify that on this *14th* day of *December*, 20*16*, the foregoing Deed of Conveyance and Consideration Certificate was produced to me and was signed, sworn to, acknowledged and delivered by **DOUGLAS W. SAILORS** and **JAMIE L. O'BRYAN, Trustees of the SO TRUST, DATED OCTOBER 11, 2013**, Grantees herein,

Dennis W. Sullivan
State At Large, Kentucky
Notary Public
Commission No. 557697
My Commission Expires 6/25/2020

Notary Public *Dennis W. Sullivan*
My Commission Expires *6.25.2020*

This instrument prepared without title examination by:

_____

George O. Pearson, Esq.
KY Bar ID 54036
203 West Second Street
Lexington, KY 40507
(859) 253-2789

*U06139920*

1371  12/22/2016  80578716/1
DOCUMENT NO: 1591209
RECORDED:July 31,2017  03:21:00 PM
TOTAL FEES:$20.00 TRANSFER TAX:$0.00
COUNTY CLERK: DAVID "OZ" OSBORNE
DEPUTY CLERK: SARA MOWERS
COUNTY: DAVIESS COUNTY
BOOK: D983    PAGES: 665 - 668



662 Woodward Avenue | Detroit, MI 48226
888.848.5355 *phone* | 800.652.7033 *fax* | titlesource.com

Thank you for trusting Title Source with your refinance or purchase transaction.

Enclosed are your original transaction document(s). This information was recorded at the county and state where the property is located. Please retain these documents for your records. **No further action is required.**

If your documentation is stamped with a *'Recorded Electronically'* stamp, this signifies that your transaction document(s) were submitted and recorded electronically at your county's Register of Deeds office. In this case, Title Source will also send you a copy of your electronically recorded document(s).

Please note: If you signed a mortgage, your recorded mortgage documentation was sent directly to your Lender.

Title Source is proud to provide you with customized solutions, unparalleled service and cutting edge technology. Please contact us if you sell or refinance your property at a later date. We would welcome the opportunity to work with you again.

If you have any questions, comments or concerns, please contact our Client Relations team at 888.848.5355 ext. 72000 or via e-mail at clientrelations@titlesource.com.

**FILED**
JAMES J. VILT, JR. - CLERK

NOV - 4 2022

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **PLAINTIFF** | ) Criminal Action No. 4:22mj-68-JHM |
| v. | ) SENIOR JUDGE JOSEPH H. MCKINLEY, JR. |
| | ) |
| **DOUGLAS SAILORS** | ) |
| | ) |
| **DEFENDANT** | ) |
| | ) |

## WAIVER OF RIGHT TO HAVE APPOINTED COUNSEL

The undersigned acknowledges that he has been informed by the Court of the

charges against him and the nature of the proceedings before the Court, of his right to be

represented by counsel throughout the case, and of his right to have counsel appointed to

represent him if he is financially unable to obtain counsel, all of which he understands.

The undersigned now states to the Court that he does not desire to have counsel appointed

to represent him and waives such appointment.

Dated this 4th day of November 2022.

_____
DEFENDANT

_____
WITNESS

AO 466 (Rev. 12/17) Waiver of Rule 32.1 Hearing (Violation of Probation or Supervised Release)

# UNITED STATES DISTRICT COURT
### for the
Western District of Kentucky

*FILED*
JAMES J. VILT, JR. - CLERK
NOV - 4 2022
U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 4:22MJ-00068-HBB |
| DOUGLAS SAILORS | ) | |
| | ) | Charging District's Case No. 22-60210-cr-Singhal/Damian |
| *Defendant* | ) | |

## WAIVER OF RULE 32.1 HEARING
### (Violation of Probation or Supervised Release)

I understand that I have been charged with violating the conditions of probation or supervised release in a case pending in another district, the *(name of other court)*     Southern District of Florida     .

I have been informed of the charges and of my rights to:

(1)     retain counsel or request the assignment of counsel if I am unable to retain counsel;

(2)     an identity hearing to determine whether I am the person named in the charges;

(3)     production of certified copies of the judgment, warrant, and warrant application, or reliable electronic copies of them if the violation is alleged to have occurred in another district;

(4)     a preliminary hearing to determine whether there is probable cause to believe a violation occurred if I will be held in custody, and my right to have this hearing in this district if the violation is alleged to have occurred in this district; and

(5)     a hearing on the government's motion for my detention in which I have the burden to establish my eligibility for release from custody.

I agree to waive my right(s) to:

☑     an identity hearing and production of the judgment, warrant, and warrant application.

☐     a preliminary hearing.

☐     a detention hearing.

☐     an identity hearing, production of the judgment, warrant, and warrant application, and any preliminary or detention hearing to which I may be entitled in this district.  I request that my
☐ preliminary hearing and/or  ☐ detention hearing be held in the prosecuting district, at a time set by that court.

I consent to the issuance of an order requiring my appearance in the prosecuting district where the charges are pending against me.

Date: **Nov 4, 22**

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*